UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| RICK SAVAGE, individually and on behalf of TWO BROTHERS, LLC d/b/a SUNDAY RIVER BREWING COMPANY, MIKE MERCER, JAMES FAHEY, and LINDSEY CROSBY, | ) ) ) ) ) ) | |
| Plaintiffs, | ) | 1:20-cv-00165-LEW |
| | ) ) | |
| v. | ) ) | |
| JANET T. MILLS, in her official capacity as the Governor of the State of Maine, | ) ) ) | |
| Defendant. | ) ) | |

## ORDER ON DEFENDANT'S MOTION TO DISMISS

On June 23, 2020, Defendant Janet T. Mills filed a Motion to Dismiss Plaintiffs' Second Amended Complaint on the grounds that Plaintiffs lack Article III standing and fail to state a claim upon which relief can be granted.  Motion to Dismiss (ECF No. 22).  For reasons that follow, Defendant's Motion will be GRANTED and this case is DISMISSED.

## BACKGROUND

A motion to dismiss challenges the adequacy of the complaint's allegations. Accordingly, I recite the allegations here, along with additional facts pertinent to the motion.[1]

---

[1] "While a district court is generally limited to considering facts and documents that are part of the complaint, it may also consider documents incorporated by reference in the complaint, matters of public record, and other matters susceptible to judicial notice."  *Newton Covenant Church v. Great Am. Ins. Co.*, 956 F.3d 32, 35 (1st Cir. 2020) (internal citation and punctuation omitted).

Governor Mills began to exercise executive power on March 15, 2020, when she proclaimed a State of Civil Emergency to Protect Public Health in response to the COVID-19 outbreak.  Second Amended Complaint (hereinafter "Compl.") ¶ 22.  Subsequently, the Governor issued a series of Executive Orders to contain the spread of the virus and protect Maine's health care system.

On March 18, 2020, the Governor issued Executive Order 14 FY 19/20, which required all restaurants and bars statewide to close except for carry out and delivery service, and prohibited gatherings of more than ten people.  Compl. ¶ 23.  The next week the Governor issued Executive Order 19 FY 19/20, which required all "non-essential" businesses to cease "public facing" activities.  Compl. ¶ 24.  At all times, non-essential businesses that were not public facing could continue to operate, provided that the workplace could accommodate appropriate social distancing or had 10 or fewer employees. *Id*.  On March 31, 2020, the Governor issued Executive Order 28 FY 19/20, which required people to stay at home except when performing "essential activities" and to "stay 6 feet apart when outside the home."  Compl. ¶ 25.  On April 3, 2020, the Governor issued Executive Order 34 FY 19/20, which required that "any person, resident or non-resident, traveling into Maine must immediately self-quarantine for 14 days."  Compl. ¶ 26.

On April 29, 2020, the Governor issued Executive Order 49 FY 19/20, which extended Orders 14, 19, 28 and 34 through May 31, 2020.  Compl. ¶ 27.  Executive Order 49 also directed the Commissioner of the Maine Department of Economic and Community Development (DECD) to implement a Restarting Plan, which would "identify businesses and activities where current restrictions may be adjusted to safely allow for more economic

and personal activity." Motion to Dismiss, Ex. 6. Under the Restarting Plan, barber shops and hair salons (among other businesses) could open as of May 1, 2020, and restaurants (among other businesses) could open as of June 1, 2020, "provided that they comply with detailed checklists." Compl. ¶¶ 28-29. Additional types of businesses could open on July 1, 2020. Compl. ¶ 30.

Plaintiffs filed suit on May 8, 2020, alleging that the Governor's executive orders negatively affected their respective businesses. By that time, the complete closure of so-called non-essential, public-facing businesses was ended. [2]

On May 29, 2020, the Governor issued Executive Order 55 FY 19/20. The order, effective May 31, 2020, modified Executive Order 14 by increasing the size of permissible gatherings to 50 people. Motion to Dismiss, Ex. 7. The order further stated:

> The distinction between essential and non-essential businesses set forth in Executive Order 19 shall continue to be phased out consistent with the implementation of the Restarting Plan. Any essential or non-essential business not authorized by Executive Order 19 or the Restarting Plan to be open shall continue to comply with pertinent provisions of Executive Order 19 until so authorized. Any business authorized now to be open shall comply with the pertinent COVID-19 Prevention Checklist or other State of Maine Guidance.

*Id.* The order also allowed people to leave home to access all reopened businesses. *Id.*

On June 9, 2020, the Governor issued Executive Order 57 FY 19/20. Motion to Dismiss, Ex. 8. The order repealed and replaced Executive Order 34, which had required those entering Maine to self-quarantine for 14 days. Pursuant to Executive Order 57, people entering Maine now must either (1) "[r]eceive a recent negative test for COVID-19

---

[2] Although it appeared at the time that Plaintiffs would immediately pursue injunctive relief, almost three more months have passed without Plaintiffs filing a motion.

in accordance with standards established by Maine CDC and set forth in the Keep Maine Healthy Plan" or (2) "[q]uarantine for 14 days upon arrival in Maine." *Id.* However, persons traveling from New Hampshire and Vermont are exempt from these requirements (and thus need not self-quarantine upon arrival in Maine regardless of whether they have a negative COVID-19 test). *Id.*

Plaintiffs are Maine residents. The named plaintiffs are: (1) Rick Savage, individually and on behalf of Two Brothers, LLC d/b/a Sunday River Brewing Company; (2) Mike Mercer; (3) James Fahey; and (4) Lindsey Crosby. The Plaintiffs also purport to bring this lawsuit as a class action on behalf of "over 20 identified Maine businessowners, businesses, customers, and employees adversely impacted by the Governor's executive orders, the partial shutdown of the State, and the mass quarantine of its citizens." Compl. ¶ 40.

In addition to the foregoing facts, Plaintiffs base their civil action on the following "general allegations":

33. Although the coronavirus is highly contagious, it does not invariably result in COVID-19. For those who do develop COVID-19, the mortality rate is low. As of May 4, 2020, the State reported on its official coronavirus webpage 1226 suspected or confirmed cases of COVID-19, which is roughly 0.09% of the State population. Even for the known fractional percent of those who have developed COVID-19, the State reports a 95% survival rate. As a result, only 0.005% of the State's population has succumbed to the virus.

34. In all likelihood, the survival rate in Maine is far higher. Recent antibody testing conducted in New York State and a study in Los Angeles suggest that millions more have been infected with the coronavirus than previously known, and that the supermajority of those previously infected were either asymptomatic or experienced mild reactions to it. In New York, this new information has dropped the mortality rate to 0.5%—i.e., a survival rate of

99.5%. In Los Angeles, it dropped the mortality rate to 0.1–0.3%—i.e., a survival rate of 99.7–99.9%. There is no reason to believe that Maine is exempt from this good news. As more Maine residents are tested, increases in positive tests will yield a higher survival rate.

35. The number of deaths caused by COVID-19, while unquestionably tragic, is not "unprecedented," as routinely claimed. What is unprecedented is Governor Mills' response to it.

36. In the late 1960s, the Hong Kong Flu swept across the globe killing more than 1 million people. The CDC estimated that 100,000 people died in the U.S. Maine, like other States, was affected. Governor Kenneth Curtis did not place residents under house arrest or shutdown the economy.

37. Governor Mills repeatedly states that decisions must be made on data. Yet, despite the positive State-specific data, the Governor has tightened restrictions through further executive orders.

38. An economic depression is predictable following the shutdown of civil society caused by the Executive Orders. Businesses around Maine are permanently closing because they cannot pay employees and vendors. More will be forced to permanently close the longer that the Executive Orders and any similarly drafted successor orders are in place.

39. Plaintiffs want to reopen their businesses, but Governor Mills forbids them from doing so under pain of criminal punishment and civil fines. Plaintiffs should not be forced to choose between risking criminal prosecution and economic sanctions on the one hand, or exercising their constitutional rights on the other.

## DISCUSSION

Through the Motion to Dismiss, the Governor contends Plaintiffs lack Article III standing and have failed to state a claim for which relief can be granted. When faced with a motion to dismiss on both jurisdictional and merits grounds, "absent good reason to do otherwise," a district court should decide the jurisdictional issue first. *Ne. Erectors Ass'n*

of BTEA v. Sec'y of Labor, Occupational Safety & Health Admin., 62 F.3d 37, 39 (1st Cir. 1995).

## A.   STANDING

"[T]he core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Article III standing contains three elements:(1) injury-in-fact, (2) causation, and (3) redressability. *Id.* at 560-61. *See also Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014) ("An injury sufficient to satisfy Article III must be concrete and particularized and actual or imminent, not conjectural or hypothetical." (quotation marks omitted)). In addition, "prudential concerns ordinarily require a plaintiff to show that his claim is premised on his own legal rights (as opposed to those of a third party), that his claim is not merely a generalized grievance, and that it falls within the zone of interests protected by the law invoked." *Pagán v. Calderón*, 448 F.3d 16, 27 (1st Cir. 2006). "The party invoking federal jurisdiction bears the burden of establishing these elements." *Lujan*, 504 U.S. at 561. "[E]ach element [of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Id.* While it is true that "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice," *id.*, "the plaintiff must 'clearly...allege facts demonstrating' each element." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)).

Defendant's Motion primarily argues that Plaintiffs fail to plead an injury in fact, the "[f]irst and foremost of standing's three elements." *Spokeo*, 136 S. Ct. at 1547. To adequately plead such an injury, the Plaintiffs must show they suffered "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Id.* They must also show that the injury is "fairly traceable to the challenged action." *Dantzler, Inc. v. Empresas Berrios Inventory & Operations, Inc.*, 958 F.3d 38, 47 (1st Cir. 2020). The "traceability" or causation element "requires the plaintiff to show a sufficiently direct causal connection between the challenged action and the identified harm." *Id.* The First Circuit holds Plaintiffs to this task. For example, the Circuit remanded with instructions to dismiss a recent case whose complaint "sets forth only a diffuse description of the asserted injuries and that omits any facts that explain how those injuries could be identified as resulting from [the allegedly harmful action]." *Perez-Kudzma v. United States*, 940 F.3d 142, 146 (1st Cir. 2019). In the context of this case, therefore, alleging Article III standing requires Plaintiffs to describe with particularity how their alleged injuries result from some actions on the part of the Defendant, Governor Mills.

Taking the allegations in Plaintiffs' Complaint as true, I find they have done enough to have standing under Article III. As the First Circuit has made clear, wallet injury or "actual economic loss...is the prototypical concrete harm." *Gustavsen v. Alcon Labs., Inc.*, 903 F.3d 1, 8 (1st Cir. 2018). Plaintiffs have alleged exactly this: lost profits for their various businesses as a result of Governor Mills' COVID-19-related executive orders.

> The Executive Orders prevent the Named Plaintiffs and Class members from operating their business and thereby prevent the Named Plaintiffs and Class members, individually, from generating revenue. By preventing the Named Plaintiffs and Class members' from operating their respective businesses, the

> Executive Orders have damaged and harmed the Plaintiffs' businesses and
> significantly impaired their use.

Compl. ¶¶ 134-35.  That Plaintiffs fail to link their harm to a specific Executive Order,
rather than the Defendant's regulations as a whole is not fatal to Article III standing.  "At
the pleading stage, general factual allegations of injury resulting from the Defendant's
conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations
embrace those specific facts that are necessary to support the claim.'"  *Lujan* 504 U.S. at
561.  Because Plaintiffs[3] have alleged sufficient facts to establish a concrete injury-in-fact,
I find they have Article III standing to sue in this Court and deny Defendant's Motion to
Dismiss on jurisdictional grounds.

## B.   FAILURE TO STATE A CLAIM

Defendant alternatively moves to dismiss Plaintiffs' case for failure to state a claim
upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  To survive a motion to dismiss
for failure to state a claim, "a complaint must contain sufficient factual matter...to state a
claim to relief that is plausible on its face."  *Guadalupe-Báez v. Pesquera*, 819 F.3d 509,
514 (1st Cir. 2016) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  The Rule
12(b)(6) analysis has two steps.  First, I "separate the complaint's factual allegations (which
must be accepted as true) from its conclusory legal allegations (which need not be

---

[3] Plaintiff Rick Savage purports to advance a claim on behalf of a Limited Liability Company, Two
Brothers, LLC.  Plaintiff Lindsey Crosby also conducts her business through an LLC.  A Limited Liability
Company is a distinct legal entity with standing to sue and be sued in its own right.  Plaintiffs Savage and
Crosby and their respective LLC's have separate and distinct legal rights and obligations.  *See* 31 M.R.S. §
1504, 1505; *Clark v. Benton, LLC*, 2018 ME 99, ¶ 16, 189 A.3d 761, 767; *Town of Lebanon v. E. Lebanon
Auto Sales LLC*, 2011 ME 78, ¶ 8, 25 A.3d 950, 953.  Rick Savage and Lindsey Crosby lack standing to
sue on the LLCs' behalf.  I will consider only their personal claims when discussing whether Plaintiffs have
stated claims for which relief may be granted.

credited)." *Id.*  Then, I determine whether "the well-pleaded facts, taken in their entirety, permit the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.  Put another way, "an unadorned, the defendant-unlawfully-harmed-me accusation" is not enough.  *Id*.

Before diving into Plaintiffs' eleven counts, a brief note about the legal standard I will apply to those claims arising under the U.S. Constitution.  The Defendant, in part, seeks shelter behind the capacious precedent of *Jacobson v. Massachusetts*, 197 U.S. 11 (1905), a decision upholding the imposition of a fine pursuant to a municipal regulation requiring inhabitants to be vaccinated against a smallpox outbreak.  Because the facts of that case are distinguishable – a different public health crisis in a different time, threatening different types of injuries to the Plaintiffs – I do not consider *Jacobson* to be a *de jure* immunity talisman, which is what it will be if judges routinely dismiss cases at the pleading stage based on the immediate evaluation of the merits of governmental action in derogation of constitutional rights.  Nor am I convinced that *Jacobson* will be the Rosetta Stone for evaluating the merits of a challenge to any COVID-19-related government regulation.  *See Calvary Chapel Dayton Valley v. Sisolak*, __ U.S. __, (slip op. at 5) (July 24, 2020) (Alito, J, dissenting) ("[I]t is a mistake to take language in *Jacobson* as the last word on what the Constitution allows public officials to do during the COVID–19 pandemic.  Language in *Jacobson* must be read in context, and it is important to keep in mind that *Jacobson* primarily involved a substantive due process challenge to a local ordinance requiring residents to be vaccinated for small pox.  It is a considerable stretch to read the decision as

establishing the test to be applied when statewide measures of indefinite duration are challenged under the First Amendment or other provisions not at issue in that case."); *see also Bayley's Campground Inc. v. Mills,* ___ F. Supp. 3d ___, No. 2:20-CV-00176-LEW, 2020 WL 2791797, at *8 (D. Me. May 29, 2020) (finding the *Jacobson* standard did not apply to a contemporary right-to-travel claim).  Nevertheless, even without *Jacobson*, the Governor's arguments for dismissal of the complaint are sound.

Interested readers should also understand that Plaintiffs' claims, with one exception, permit only injunctive relief.  Absent an affirmative waiver on the part of the State, the Eleventh Amendment does not allow Plaintiffs to seek in this Court, or allow a federal court to award, monetary damages against the State of Maine, and this suit against the Governor in her official capacity would be, functionally, a claim directed at the state treasury, to the extent Plaintiffs might request relief in the form of money damages (they have not done so).  *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 66 (1989). Moreover, a suit that is the functional equivalent of a § 1983 suit against a State does not lie in the first place, because the State is not a person for purposes of § 1983 of the Civil Rights Act.  *Id.* at 66-67; *Arizonans for Official English v. Arizona*, 520 U.S. 43, 69 & n.24 (1997).

### 1.  Counts II, VI, XI

Plaintiffs do not object to the dismissal of Counts II, VI, and XI, their claims under the Privileges and Immunities Clause of Article IV, section 2 of the U.S. Constitution and the Equal Protection Clause, and their claim that the Governor's Orders failed to comply

with Maine's statutory requirements for notice and comment rulemaking.  Defendant's

Motion is, therefore, granted as to these three claims.

### 2.  Dormant Commerce Clause

In Count I, Plaintiffs assert a violation of the dormant Commerce Clause.  The

Commerce Clause, found in Article I, section 8, clause 3 of the United States Constitution,

gives Congress the power "[t]o regulate commerce ... among the several states."  Courts

have consistently held that this affirmative grant of power to Congress includes a negative

implication, which restricts the ability of states to regulate and interfere with interstate

commerce.  *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, __U.S.__, 139 S. Ct. 2449,

2459 (2019).  That restriction, referred to as the dormant Commerce Clause, "prohibits

economic protectionism—that is, regulatory measures designed to benefit in-state

economic interests by burdening out-of-state competitors."  *Fulton Corp. v. Faulkner*, 516

U.S. 325, 330 (1996) (internal quotation marks omitted).  Under the dormant Commerce

Clause, courts "protect[ ] the free flow of commerce, and thereby safeguard[] Congress'

latent power from encroachment by the several States[]" when Congress has not

affirmatively exercised its Commerce Clause power.  *Merrion v. Jicarilla Apache Indian

Tribe*, 455 U.S. 130, 154 (1982).

Plaintiffs allege that the Executive Orders, and "in particular" the quarantine

requirement, "impermissibly restrict plaintiffs and their customers from exercising the

right to engage in interstate commerce."  Compl. ¶ 52.  For a state regulation to violate the

Commerce Clause, I must find that it either facially discriminates against out-of-state

interests, s*ee, e.g., Family Winemakers of California v. Jenkins,* 592 F.3d 1, 10 (1st Cir.

2010), or indirectly hinders interstate commerce where the "burden on interstate commerce clearly exceeds the local benefits." *Pharm. Care Mgmt. Ass'n v. Rowe*, 429 F.3d 294, 312 (1st Cir. 2005) (citing *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)).

Concerning interstate commerce, Plaintiffs focus on the Governor's 14-day quarantine requirement as refined by Executive Order 57 (allowing out-of-state travelers to come to Maine within days of a negative COVID-19 test), alleging that "those restrictions impermissibly restrict Plaintiffs and their customers from exercising the right to engage in interstate commerce." Compl. ¶ 52; Opposition at 14. Although Plaintiffs approach this issue as a cohesive unit, in fact their claims are distinct and require individualized assessment. When Plaintiffs are considered individually, it is apparent that none has a viable claim for injunctive relief under the dormant Commerce Clause.

Rick Savage is an individual who evidently has a membership interest in Two Brothers, LLC, which LLC does business as Sunday River Brewing Company. Rick Savage is not the proper plaintiff to advance a claim concerning a regulation that stifles the LLC's ability to procure interstate business. *See* footnote 2, *supra*.

"Mike Mercer is a security consultant whose business has been severely affected by the Defendant's … actions." Compl. ¶ 12. Mike Mercer's threadbare allegations do not afford any meaningful data points suggesting his claim implicates the concerns of the dormant Commerce Clause.

"James Fahey is a wedding disc jockey whose business has been destroyed by the Defendant's … restrictions." *Id.* ¶ 11. Although I can accept as a reasonable inference that the volume of wedding ceremonies is reduced by a regulation that burdens interstate

travel and gatherings of more than 50 persons, there can be little doubt that what is transpiring across the Nation and around the globe has dramatically reduced the demand for large scale nuptials.  Plaintiff has not alleged circumstances from which a fact finder might infer, on a non-speculative basis, that the Governor's regulations (as opposed to the national reaction to the pandemic itself) "destroyed" demand for his services.

"Lindsey Crosby is the owner of Harper Method Hair, LLC in South Portland.  [Her] hair salon … is being forced to operate at half capacity under the Defendant's … restrictions."  *Id.* ¶ 13.  Crosby's claim is even more attenuated than Fahey's.  She challenges the particulars of how many persons she can serve per day, due to social distancing regulations.  What this has to do with the dormant Commerce Clause is anybody's guess.

Plaintiffs' allegations describe only generalized harm to their businesses, and their failure to substantiate how the Defendant's Orders, as applied to them, disfavor out-of-state businesses or hinder interstate commerce generally, is fatal to their dormant Commerce Clause claim.  *Cf. Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 261 n.8 (2d Cir. 2013) ("[C]onclusory allegations ... are an insufficient basis upon which to sustain a claim of discrimination against interstate commerce.").  Consequently, I find Plaintiffs fail to state a dormant Commerce Clause claim, and I will grant Defendant's Motion as to Count I.

### 3.  Right to Travel

In Count III, Plaintiffs assert a violation of the right to travel, claiming a violation of their rights and their customers' rights.  Plaintiffs have failed to provide the needed factual allegations to sustain a right to travel claim under the Privileges and Immunities

Clause of the Fourteenth Amendment.  Plaintiffs have not alleged they are seeking to travel interstate.  And even if they did, it is not clear from the Complaint how the Governor's Orders would have prevented them from doing so.  In all other respects, each individual Plaintiff's travel claim suffers from the same defects I described above in relation to the dormant Commerce Clause theory, to wit: Savage is the wrong plaintiff as visitors to Sunday River Brewing Company are not his patrons and the Company is now able to serve customers, in any event, including residents of New Hampshire and Vermont and also persons from other states if those persons comply with existing restrictions; Mercer's allegations are unfathomable; the correlation between the demand for Fahey's DJ services and Order 57 is unstated and unmeasurable given the public's reaction to the COVID outbreak; and Crosby's concern over the number of clients she can serve while social distancing does not even implicate Order 57, either expressly or by a process of the most generous inferential reasoning.  Because Plaintiffs have not pled the basis for a right to travel claim, I will grant Defendant's motion to dismiss Count III.

### 4.  Procedural Due Process

Count IV asserts a claim for violation of procedural due process.  Plaintiffs fail to state a claim that their rights to procedural due process have been violated.  Plaintiffs allege: "Governor Mills has not provided any procedural due process before issuing the Executive Orders.  Nor do the Executive Orders provide any mechanism for post deprivation review." Compl. ¶ 78.  They believe they "are suffering substantial losses of liberty and property," specifically, "[b]ecause Governor Mills failed to provide any pre- or post-deprivation review of the orders and rules shuttering their businesses."  *Id.* ¶ 82.

As I observed in an earlier decision considering the constitutionality of Governor Mills' COVID-related Executive Orders, it ought to be apparent to Plaintiffs that "police power is routinely exercised in this Country without first conducting public or private hearings, and without offending the Constitution." *Bayley's Campground,* 2020 WL 2791797, at *11. So too here.

While due process "normally requires notice and opportunity for 'some kind of hearing' prior to a final deprivation of liberty or property ... [t]his generalization is a very loose one." *Herwins v. City of Revere*, 163 F.3d 15, 18 (1st Cir. 1998) (internal citations omitted). The Supreme Court has explained that "summary administrative action may be justified in emergency situations," *Hodel v. Va. Surface Mining & Reclamation Ass'n, Inc.*, 452 U.S. 264, 299-300 (1981), "and the reason is not hard to grasp." *S. Commons Condo. Ass'n v. Charlie Arment Trucking, Inc.*, 775 F.3d 82, 86 (1st Cir. 2014). "By their nature, emergency situations require an immediate response. And, in consequence of the necessity of quick action by the State, constitutional due process does not require the usual up-front procedural protections in dealing with emergencies." *Id.* (internal citation and quotation marks omitted). As an initial matter, therefore, I find Plaintiffs are not entitled to any sort of pre-deprivation process when it comes to a generalized police policy imposed during this type of public health emergency.

Furthermore, to state such a due process claim, Plaintiffs must allege the defendant deprived them of a liberty or property interest without adequate process. *See, e.g., González-Droz v. González-Colón*, 660 F.3d 1, 13 (1st Cir. 2011); *Aponte-Torres v. Univ. of P.R.*, 445 F.3d 50, 56 (1st Cir. 2006). Plaintiffs allege their purported interest only in a

conclusory fashion.  They contend the Governor deprived them of a liberty and property because the Executive Orders allegedly cause the "shuttering [of] their businesses." Compl. ¶ 82.  But, as discussed above, their businesses are presently allowed to operate, and, even if they were not, that alone would not constitute deprivation entitled to Due Process protections.  *See Coll. Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 675 (1999) ("business in the sense of the activity of doing business, or the activity of making a profit is not property in the ordinary sense.").[4]  Plaintiffs have failed to state a procedural due process claim that would entitle them to injunctive relief lifting existing restrictions on the operation of their businesses.  I, therefore, grant Defendant's Motion to dismiss the procedural due process claim in Count IV.[5]

### 5.  Substantive Due Process

In Count V, Plaintiffs assert a substantive due process claim.  Compl. ¶¶ 85-95. Ordinarily, there are two theories under which a plaintiff may bring a substantive due process claim.  Either a plaintiff must demonstrate the deprivation of a "fundamental" interest protected by the Fourteenth Amendment or demonstrate conduct that "shocks the conscience" (or both).  *Sever v. City of Salem, Mass.*, No. 19-1831, 2020 WL 948413, at *1 (1st Cir. Feb. 14, 2020).

---

[4] For reasons indicated in the introduction of section B, if there is to be a post-deprivation remedy involving money damages, Plaintiffs must seek it in state court.

[5] Plaintiffs' claims of regulatory taking are also a species of due process claim because they necessarily proceed by virtue of incorporation of takings jurisprudence into the Fourteenth Amendment's Due Process Clause.  Although I dismiss the claim for injunctive relief pursuant to the procedural component of the Due Process Clause, I have considered the takings claim separately.

The Supreme Court has long recognized that a state can avoid this close constitutional scrutiny of alleged violations of substantive due process during a public health crisis. *Jacobson v. Massachusetts*, 197 U.S. 11, 27 (1905) ("a community has the right to protect itself against an epidemic of disease which threatens the safety of its members."). While such an epidemic is ongoing the Supreme Court has applied a gentler analysis to substantive due process claims: that courts should only overturn state action when it lacks a "real or substantial relation to the protection of the public health" or represents "a plain, palpable invasion of rights secured by the fundamental law." *Jacobson*, 197 U.S. at 31; *see also In re Abbott,* 954 F.3d 772, 784 (5th Cir. 2020) (applying *Jacobson* to a substantive due process claim during the COVID epidemic).[6] Plaintiffs do not allege Defendant's executive orders are unrelated to protecting public health, and only assert a liberty interest in their ability to run their respective businesses.[7] *See, e.g.,* Compl. ¶ 88-90. Harm to business interests, however, is not a "plain, palpable invasion of rights" under the Fourteenth Amendment. *See Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl.*

---

[6] In an earlier case alleging Governor Mills' Executive Orders violated plaintiffs' constitutional right to travel, I noted that *Jacobson* does not supply the legal standard for all constitutional claims during a public health crisis. *Bayley's Campground Inc. v. Mills*, No. 2:20-CV-00176-LEW, 2020 WL 2791797, at *8 (D. Me. May 29, 2020) (applying right-to-travel jurisprudence, rather than *Jacobson,* to a right-to-travel claim). Although I called *Jacobson* into question in the course of that decision, *id.* at 7 ("It barely authorizes judicial review at all."), I nevertheless follow it here because it is a binding precedent for assessing substantive due process claims during a public health crisis.

[7] Plaintiffs argue, in part, that the Governor's Executive Orders shock the conscience because events are not unprecedented. They remind us that Governor Kenneth Curtis, in 1968, did not take similar measures to combat the spread of "the Hong Kong flu." Opposition at 3. The argument overlooks several pertinent concerns, including the scale of modern interstate travel and the existence of mass communication technologies that facilitate a more interventionist approach. Plaintiffs further argue that the Governor's conduct is outrageous because deaths predominantly befall seniors, who do not participate in the labor market in significant numbers. *Id.* However, seniors do dine at restaurants, attend weddings, and get their hair cut.

*Prot.*, 560 U.S. 702, 721 (2010) (noting that "the 'liberties' protected by substantive due process do not include economic liberties").   Therefore, because the Complaint fails to make the case that the Orders are outside the realm of protecting public health, or that they are a plain, palpable infringement a cognizable Fourteenth Amendment right, I will grant Defendant's Motion to Dismiss Count V.

### 6.  Takings Clause

Plaintiffs' final federal claim is found in Count X, where Plaintiffs contend Defendant violated the Fifth Amendment's Takings Clause (as incorporated in the Fourteenth Amendment).  Compl. ¶¶ 132-138.  They state the Executive Orders "prevent [them] from operating their business[es] and … generating revenue" "jeopardiz[ing] the continued viability of their businesses."  Compl. ¶¶ 134,136.  As of this writing, Plaintiffs' businesses may operate, and Plaintiffs do not allege facts suggesting the extant Orders deny them "all economically beneficial" engagement in their respective business activity.  *Cf. Murr v. Wisconsin*, 137 S. Ct. 1933, 1943 (2017) ("[D]enial of all economically beneficial use of land constitutes a regulatory taking.").

The concern, then, is whether Plaintiffs have alleged a temporary regulatory taking arising from the shuttering of their businesses for a time.  *First English Evangelical Lutheran Church v. County of Los Angeles*, 482 U.S. 304, 318 (1987) ("[T]emporary takings which ... deny a landowner all use of his property, are not different in kind from permanent takings, for which the Constitution clearly requires compensation.").  The idea that a regulatory taking claim could arise out of a COVID-related order is not implausible. A claim of temporary regulatory taking calls for "a careful inquiry informed by the

specifics of the case," involving an analysis "driven 'by the purpose of the Takings Clause, which is to prevent the government from 'forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'" *Id.* (quoting *Armstrong v. United States,* 364 U.S. 40, 49 (1960)).

To state a taking claim, it is not enough to allege that government conduct frustrated a business enterprise, as Plaintiffs have alleged here. *Coll. Sav. Bank*, 527 U.S. at 675. Takings jurisprudence is directed at government conduct that denies beneficial use of *property*, meaning things like legal interests in real or personal property, not the liberty interest to engage in business activity. *Id.* "[F]ederal property interests under the 14th Amendment usually arise from rights created by state statutes, state or municipal regulations or ordinances, and contracts with public entities." *O'Gorman v. City of Chi.*, 777 F.3d 885, 890 (7th Cir. 2015) (citation omitted). Nevertheless, "whether a particular state-created interest rises to the level of a 'legitimate claim of entitlement' is a question of federal law." *Dibble v. Quinn*, 793 F.3d 803, 808 (7th Cir. 2015) (quoting *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 9 (1978)). *See also Dyson v. City of Calumet City*, 306 F. Supp. 3d 1028, 1040-41 (N.D. Ill. 2018) (dismissing regulatory takings claim based on the plaintiff's failure to articulate the kind of property interest with which the Takings Clause is concerned).

Given this requirement, problems immediately arise for Plaintiffs.  I begin with Mike Mercer and James Fahey.  They do not allege that they conduct their businesses from real property shuttered by executive order.  Nor do they allege any fact to suggest why a fact finder would conclude that personal property associated with their businesses was

effectively taken from them.  Presumably, they were unable to sell products and services for a time, but Plaintiffs have not cited any authority stating that the inability to sell goods and services is a taking of their property.  They have failed to state a takings claim.

Rick Savage does not appear to be in any better position.  What the Complaint states is that he has an ownership interest in the Sunday River Brewing Company, while also stating that the Sunday River business is a d/b/a of non-party Two Brothers, LLC, an entity with its own legal existence.  Maybe Savage owns or leases the premises and the business equipment.  Maybe he does not.  As with so much else about the Complaint, it is deficient in this regard.  Because one would have to speculate whether Rick Savage even has a property interest in his own right, he too fails to state a claim.

That leaves Lindsey Crosby.  Crosby "is the owner of Harper Method Hair, LLC in South Portland" and "owns a hair salon."  Compl. ¶ 13.  In other words, the Complaint tells us that Crosby owns a business, but also that she operates the business in her status as owner of an interest in an LLC.  She has the same problem as Savage.  In regard to *property*, what does she own that is not, in fact, owned by the LLC?  The operative Second Amended Complaint does not say.

Because Plaintiffs have failed to plead sufficient facts to state a claim under the Takings Clause, I grant Defendant's Motion to Dismiss Count X.

### 7.  Unconceded State Law Claims

With the exception of the claim contained in Count XI, which Plaintiffs concede, Plaintiffs' state law claims (Counts VII, VIII, and IX) are dismissed without prejudice.  In the absence of a viable federal claim that is part of the same case or controversy, or diversity

of citizenship between the parties, a state court should resolve the merits of the unconceded state law claims.

## CONCLUSION

With the exception of the takings claim that fails for independent reasons indicated above, this is a case about injunctive relief, which I must evaluate in terms of *current* rather than bygone restrictions.  In this context, Plaintiffs' conclusory legal assertions that the sum total of all commercial harm they have suffered violates the Constitution misses the mark.  The Governor's restrictions are burdensome, I recognize, and one does not have to look far to find a great number of our fellow Mainers who still are reeling from the effects of the temporary closures.  Indeed, the toll has been dear and we may continue to pay it for some time.  But it's August now, and the shuttering is past.

Many people, Plaintiffs among them, call into question the wisdom of any restrictions on commercial activity, which is a right almost universally accepted.  But these Plaintiffs have not alleged facts demonstrating a present violation of their constitutional rights that warrants injunctive relief; not while the Nation is scrambling to adapt to an unprecedented pandemic that is believed to have killed more than 150,000 Americans in four months and caused debilitating illness for many survivors.

Public health professionals and politicians have had to analyze data regarding this novel virus while executing public health policies, nearly simultaneously and continuously, for more than four months with no clear end in sight.  This collective crisis ought to have imposed a sense of collective humility given the long shadow cast by all that we do not know about the disease.  We might hope that Socratic wisdom is making a comeback.

Defendant's Motion to Dismiss is GRANTED.  Counts I, II, III, IV, V, VI, X, and XI are DISMISSED WITH PREJUDICE.  Counts VII, VIII, and IX are DISMISSED WITHOUT PREJUDICE.

**SO ORDERED.**

**Dated this 7th day of August, 2020.**

/s/ Lance E. Walker
UNITED STATES DISTRICT JUDGE